IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


EUGENE TAYLOR,
      Petitioner,

vs.                                Case No.: 3:05cv135/RV/EMT

JAMES R. McDONOUGH,[1]
      Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 6). Respondent filed an answer and relevant portions of the state court record (Docs. 26, 27). Petitioner was given an opportunity to file a reply (*see* Doc. 34), but he declined to do so.

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND AND PROCEDURAL HISTORY

      The procedural background of this case is undisputed by the parties and established by the state court record. Following a jury trial in the Circuit Court for Escambia County, Florida, on November 28, 2000, Petitioner was convicted of tampering with evidence (Doc. 27, Ex. A at 8,

---

[1]James R. McDonough succeeded James Crosby as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)(1).

131–35, Ex. B at 223).[2]  He was sentenced on March 9, 2001, as a habitual felony offender to a term of five (5) years of imprisonment with 123 days of pre-sentence jail time credit (*id.*, Ex. A at 131–35).  Petitioner appealed his conviction and sentence to the Florida First District Court of Appeal (First DCA) (*id.*, Ex. C).  The appellate court affirmed the conviction and sentence per curiam without opinion on April 19, 2002 (*id.*, Ex. E).  Taylor v. State, 814 So. 2d 1035 (Fla. 1st DCA Apr. 19, 2002) (Table).

On January 7, 2003, Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 27, Ex. G at 55–61).  Following an evidentiary hearing, the trial court denied the motion on November 19, 2003 (*id.* at 96–169).  Petitioner appealed the decision to the First DCA (*see id.*, Ex. H), and the appellate court affirmed the decision per curiam without written opinion on December 14, 2004, with the mandate issuing January 11, 2005 (*id.*, Exs. J, K).  Taylor v. State, 889 So. 2d 77 (Fla. 1st DCA Dec. 14, 2004) (Table).

In July of 2004, Petitioner filed a motion to correct illegal sentence pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (*see* Doc. 27, Ex. N, Progress Docket Printout, entry dated July 12, 2004).  The trial court granted the motion on August 4, 2004, and directed the clerk of court to amend the judgment of conviction to reflect an additional 95 days of jail credit (*id.*, Ex. L).

In August of 2004, Petitioner filed a second Rule 3.850 motion (*see* Doc. 27, Ex. N, Progress Docket Printout, entry dated August 20, 2004).  The trial court denied the motion on October 13, 2004 (*id.*, Ex. M).

On January 26, 2005, Petitioner filed a second Rule 3.800(a) motion (Doc. 27, Ex. N at 1–5).  The trial court denied the motion on February 10, 2005 (*id.* at 8).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the decision per curiam without written opinion on June 3, 2005, with the mandate issuing June 29, 2005 (*id.*, Exs. O, P).  Taylor v. State, 903 So. 2d 941 (Fla. 1st DCA June 3, 2005) (Table).

---

[2]Petitioner was also charged with resisting a law enforcement officer without violence, but the jury acquitted him of that charge.

Petitioner filed the instant habeas action on April 12, 2005 (Doc. 1 at 6). Respondent concedes that the petition is timely (Doc. 26 at 6).

II.    TRIAL EVIDENCE

Resolution of Petitioner's claims requires thorough consideration of the trial proceedings; therefore, a summary follows. Petitioner was charged with tampering with evidence and resisting an officer without violence. The factual basis for the tampering charge was that Petitioner was stopped by a law enforcement officer because the license plate of the vehicle he was driving was registered as stolen, and as an officer approached the vehicle, he observed Petitioner attempt to swallow crack cocaine.

Defense counsel filed a motion in limine to exclude certain evidence. First, defense counsel requested that the court instruct all law enforcement officers prior to trial to make no mention in the presence of the jury of the fact that the vehicle that Petitioner was driving had a stolen license plate (*id.* at 40). Defense counsel argued that although he was contesting the validity of the arrest, he was not contesting the validity of the traffic stop; therefore, the prejudice to Petitioner outweighed any probative value of any testimony about the nature of the stop (*id.* at 42–43). The trial court denied the motion on the ground that because the defense was challenging the legality of the arrest, the jury may question the reason for the stop of the vehicle; however, the court instructed the prosecutor that in her direct examination of the officer who stopped the vehicle, the prosecutor must elicit testimony that clarified that Petitioner had nothing to do with the stolen license plate (*id.* at 46). Defense counsel requested that the record reflect his continuing objection to the admission of any evidence that Petitioner was driving a vehicle with a stolen license plate, and the court granted counsel's request (*id.* at 54–55).

Defense counsel also requested that the court instruct all law enforcement officers prior to trial to make no mention in the presence of the jury that they have dealt with Petitioner in the past or that they are familiar with him and know from experience that he usually hides drugs in his mouth (*id.* at 47). The prosecutor agreed, unless the defense opened the door by indicating that Petitioner never previously conducted himself in that manner (*id.* at 48). The court granted the motion, with the following qualification:

THE COURT: All right. Well, the State is agreeing and the Court is granting your motion in limine. Obviously if somehow that becomes an issue then we'll just approach and deal with it. So I would ask if that becomes a point at a later time if the defendant should testify, we'll have a time either of approaching or doing something else out of the presence of the jury.

MR. BRANCATO [defense counsel]: Your Honor, so if he testified he didn't have dope in his mouth this time but doesn't bring out any prior instances —

THE COURT: I'll just deal with it when it comes up. It is hard to figure out how something might play itself out.

(*id.* at 48–49).

Additionally, defense counsel requested that the court instruct all officers prior to trial to make no mention in the presence of the jury that the passenger in the car Petitioner was driving was a prostitute (*id.* at 49). The State agreed, and the court instructed the officers not to mention that the passenger was a prostitute (*id.*).

Next, defense counsel moved to exclude the result of a field test that was performed on Petitioner's saliva at the scene, on the ground that a laboratory test was also performed on the saliva, and the result of the laboratory test was the best evidence (*id.* at 49–50). The court denied the motion (*id.* at 50–51).

Finally, defense counsel argued that the State was required to lay a foundation for testimony regarding the field test of Petitioner's saliva, including the qualifications of the person who conducted the test and the reliability of the field test (*id.* at 51–53). The court granted the motion to the extent that only the officer who actually conducted the test would be permitted to testify regarding the field test (*id.* at 53–54).

The theory of defense put forth by Petitioner's counsel in his opening statement was that the field test performed on Petitioner's saliva at the scene indicated the presence of cocaine, but the laboratory test performed on the saliva did not indicate the presence of illegal drugs (*see* Doc. 26, Ex. B at 65–66). Therefore, the State could not show that Petitioner tampered with evidence.

The first witness called by the State was Shawn Dockery, an officer with the Pensacola Police Department (*id.* at 67). Officer Dockery testified that when he saw Petitioner's vehicle, he initiated a license plate check and discovered that the license plate was listed with the Escambia

County Sheriff's Office as being stolen (*id.* at 68–69).  Officer Dockery initiated a traffic stop, and Petitioner pulled over (*id.* at 69–70).  Officer Dockery approached the vehicle and asked Petitioner for his driver's license and registration, and whether he was the owner of the vehicle (*id.* at 70). Petitioner responded that he did not own the vehicle (*id.*).  As Petitioner was responding, Officer Dockery noticed that Petitioner was speaking in a strange manner, mumbling and not opening his mouth, which led him to believe that Petitioner was hiding something in his mouth (*id.* at 70–71). Officer Dockery testified that he had been an officer for over ten years and received training in investigating narcotics violations (*id.* at 71–72).  He stated that it was very common for narcotics users and sellers to hide drugs in their mouths (*id.* at 72).  Officer Dockery asked Petitioner if he had any drugs in his mouth, and Petitioner began swallowing very hard (*id.* at 73).  Dockery told Petitioner, "Don't swallow it, spit it out," and Petitioner responded, "I don't have anything" (*id.*). As Officer Dockery was grabbing Petitioner, Petitioner opened his mouth, and Dockery saw a rock of crack cocaine on the back of Petitioner's tongue (*id.*).  Petitioner then swallowed very hard, and actually swallowed the cocaine (*id.* at 73–74).  Officer Dockery testified that during the encounter, Petitioner spit saliva onto his wallet, which was being held by another officer (*id.* at 74–76).  The other officer took the wallet away, and returned with a "field test," a cotton swab, that indicated the presence of cocaine (*id.* at 76–77).  Officer Dockery testified that he retained the cotton swab as evidence (*id.* at 76–77).  Defense counsel objected to admission of State's Exhibit 1, the cotton swab, into evidence on the ground that the State failed to establish the chain of custody, but the trial court overruled the objection (*id.* at 77–78).  Despite the court's overruling defense counsel's objection, the State elicited testimony from Officer Dockery that while he was at the scene, he placed the cotton swab in a plastic bag, went to the police station and placed the bag in an envelope, sealed the envelope with red tape that bore his initials and the date, and placed the envelope in the locked evidence room (*id.* at 78–79).  Officer Dockery testified that the envelope, State's Exhibit 1, also had another red seal from the Florida Department of Law Enforcement (FDLE) (*id.* at 79). Dockery stated that he opened the envelope in the prosecutor's presence earlier on the day of trial (*id.*).  Officer Dockery testified that Petitioner was arrested, and while he was handcuffed in the back of the patrol car, Petitioner said, "I didn't have anything in my mouth.  I had a leaf in my mouth." (*id.* at 81–82).  Petitioner then stuck out his tongue with a leaf on it, reached up with his hands and

took it from his mouth, and said, "Look, it was just a leaf." (*id.* at 82).  Officer Dockery testified that Petitioner was not charged with anything related to the stolen license plate (*id.* at 80).

On cross-examination, Officer Dockery testified that Petitioner was handcuffed before he was placed in the patrol car, and he did not know how Petitioner put the leaf in his mouth (*id.* at 83–84).  Officer Dockery also testified that he made contact with the owner of the vehicle that Petitioner was driving, and after speaking with the owner, Dockery concluded that Petitioner did not know anything about the stolen plate (*id.* at 84–85).  Officer Dockery testified that the object in Petitioner's mouth did not appear to be a Tic Tac, a Lifesaver, or a piece of gum, but "Anything is possible." (*id.* at 88–89).  Dockery testified that Petitioner's mouth was open wide when Petitioner was pulling away in an attempt to avoid Dockery's grasp, and it was at that time that Dockery observed the crack cocaine in Petitioner's mouth (*id.* at 90–91).  Defense counsel then asked, "You presumed what was in his mouth based on the color of his skin and the way he looks, didn't you?" (*id.* at 92).  The prosecutor objected, and a side bar conference was held.  At sidebar, the prosecutor argued that by questioning the officer regarding his reason for believing that Petitioner had drugs in his mouth, defense counsel was opening the door for the State to present evidence that another officer at the scene told Officer Dockery that on a previous occasion, Petitioner had attempted to swallow drugs in his (the other's officer) presence (*id.*).  The court gave defense counsel the choice of pursing his question and permitting the State to present testimony from the other officer, or withdraw his question (*id.* at 93–94).  Defense counsel withdrew his question (*id.* at 94).

Officer Broxson testified that she arrived at the scene after Petitioner had been stopped by Officer Dockery (*id.* at 104–05).  She testified that as she approached Petitioner's vehicle, she saw Officer Dockery put his hands around Petitioner's neck and heard him tell Petitioner, "Spit it out, spit it out." (*id.* at 105).  She saw Petitioner grab Officer Dockery's arm, pull it away from his neck, and swallow hard like he was swallowing something (*id.*).  She then saw Officer Dockery put his hands back around Petitioner's neck and try to get him to spit out whatever was in his mouth (*id.*).  Officer Broxson stated that Petitioner appeared to be attempting to spit, and to avoid him spitting in her hand, she grabbed a wallet on the dashboard and caught Petitioner's saliva in the wallet (*id.*).  Officer Broxson then took the wallet to her patrol car and conducted a field test on the sample to determine whether cocaine was present (*id.* at 106).  Broxson took a clean cotton swab, wetted it

with Petitioner's saliva, dropped a chemical called "cobalt" on it, and observed that the swab turned blue, indicating the presence of cocaine (*id.*).  Defense counsel objected to the testimony on the ground that the State failed to lay a proper foundation for the testimony, including Officer Broxson's training and qualifications to perform the test and the reliability of the test (*id*. at 106–07).  The court overruled the objection on the ground that the defense stated its intention to admit the results of a laboratory test on the saliva (*id*. at 107).  The court instructed defense counsel that he could cross-examine Officer Broxson regarding her qualifications and the reliability of the test (*id.*).

Officer Broxson further testified that she received training in narcotics investigations, that cobalt was provided to officers to use in the field to test for the presence of cocaine, and that she had performed this field test "many, many times" (*id*. at 107–09).  She testified that she placed the swab in a plastic bag to turn in as evidence (*id*. at 108).

On cross-examination, Officer Broxson testified that after she placed the swab in the plastic bag, she gave it to Officer Dockery (*id*. at 109).  When defense counsel questioned her regarding the training she received regarding conducting the field tests, Officer Dockery testified that a crime scene analyst showed the officers how to conduct the test (*id*. at 110).  She testified that she was not aware of the reliability of the test, but she knew that officers used the test often, and evidence that was submitted to FDLE for testing was returned as positive for the presence of cocaine (*id*. at 111).

Officer Hendry testified that he was also on the scene, and he observed Petitioner attempt to swallow when Officer Dockery asked to see what was in Petitioner's mouth (*id*. at 114–15).  He also testified that he observed Officer Dockery grab Petitioner around his neck to prevent him from swallowing, and Petitioner attempted to pull Dockery's hands away, so Hendry reached into the car from the passenger's side and grabbed Petitioner's hands (*id*. at 115–16).  Officer Hendry then saw Petitioner spit into the car, and he saw Officer Broxson collect Petitioner's saliva (*id*. at 116).  Officer Hendry testified that when Officer Dockery was attempting to grab Petitioner around the neck, Petitioner's mouth was closed (*id*. at 118).

The State rested its case, and defense counsel moved for a judgment of acquittal (*id*. at 118, 134).  The court denied the motion (*id*. at 134).

The first witness for the defense was Teresa Pribbenow.  She testified that she is a senior crime lab analyst with FDLE, and in that position she analyzes suspected contraband substances,

prepares written reports and, when needed, testifies in judicial proceedings (*id*. at 135–36).  She testified regarding her background, training, and experience in the area of drug analysis (*id*. at 136).  Defense counsel showed Ms. Pribbenow State's Exhibit 1, the envelope containing the cotton swab, and Ms. Pribbenow identified her laboratory bar code printout on the envelope, as well as her laboratory number written on the plastic bag and a vial in the bag (*id*. at 137).  She also testified that she opened the package on July 18, 2000, and performed two instrumental examinations on the residue from the cotton swab, and results were negative for the presence of illegal drugs (*id*. at 137–38, 140).  Ms. Pribbenow testified that the field test is more of a presumptive test, meaning it is a good indicator that cocaine could be present, but the result should be confirmed with a laboratory test because there are legal substances that could turn the swab blue (*id*. at 139).  Ms. Pribbenow's written report of the negative test results was admitted into evidence as Defense Exhibit 1 (*id*. at 140–41).  On cross-examination, Ms. Pribbenow testified that more of the cotton swabs submitted to the laboratory for confirmation result in the absence, rather than the presence, of illegal drugs (*id*. at 146).

Petitioner then testified to his recollection of the events leading to his arrest.  He testified that he was not the owner of the car he was driving, but he knew the owner and did not steal the car (*id*. at 148).  Petitioner testified that one of the officers asked him what was in his mouth, and he responded that nothing was in his mouth (*id*.).  The officer then asked him why he was talking the way he was talking, and Petitioner told him that he talked that way (*id*.).  Petitioner testified that the officer grabbed him around the neck and ordered him to spit out what was in his mouth (*id*.).  Defense counsel asked Petitioner whether he made any swallowing movements, and Petitioner testified that he was being choked and could not breathe, and all he did was try to catch his breath (*id*. at 149).  Petitioner testified that while he was being choked, his mouth was open (*id*. at 150).  When defense counsel asked Petitioner if he had anything in his mouth, Petitioner responded, "I had a leaf in my mouth is about all." (*id*.).  Petitioner testified that he smokes a lot of cigarettes, and he puts something in his mouth to keep him from wanting to smoke (*id*. at 151).  Petitioner testified that when he spat on the wallet, he still had the leaf in his mouth (*id*. at 152).  Despite the presence of the leaf, he told the officer he did not have anything in his mouth because the officer was telling him to spit out the cocaine, and Petitioner did not have any cocaine in his mouth (*id*.).  Petitioner denied

that he grabbed a leaf off the floor of the patrol car, and he stated that he did not believe he could have done that in light of the fact that he was handcuffed (*id*. at 154). Petitioner denied that he even attempted to destroy anything from the time he was stopped by the officers to the time of his arrest (*id*. at 155).

On cross-examination, Petitioner testified that he had been convicted of six crimes of dishonesty and nine felonies (*id*. at 156). He testified that the leaf was visible in his mouth—that the officer had to see it (*id*. at 158). He stated that when he spit out the saliva, the leaf stayed on the side of his mouth (*id*. at 158–59). The prosecutor asked why Petitioner did not just spit the leaf out if the officers thought he had something in his mouth and it was just a leaf (*id*. at 162). Petitioner responded that the leaf was visible, and the officer never asked him to spit it out (*id*.). Petitioner testified that the officer told him he was being arrested for a stolen license plate, and he did not hear anything about cocaine until he arrived at the jail (*id*. at 153, 160–63).

The defense rested, and the State recalled Officer Dockery. Officer Dockery testified that after he placed Petitioner under arrest, he searched Petitioner, including his pockets, his person, and his mouth (*id*. at 165). He testified that when he searched Petitioner's mouth, he told him to open his mouth and lift his tongue, and when Petitioner opened his mouth, Officer Dockery did not see any leaves or debris in his mouth (*id*. at 165). Officer Dockery testified that he told Petitioner that the reason he was pulled over was the stolen tag, but that he was not being charged in relation to that (*id*. at 165–66).

Defense counsel renewed his motion for judgment of acquittal on both counts, but the court again denied the motion (*id*. at 167–69). During closing argument, defense counsel argued, among other things, that Officer Dockery was "predisposed" to believe that Petitioner had drugs in his mouth because of the way he (Petitioner) looked (*id*. at 190). He further argued:

> It wouldn't happen to me and it wouldn't happen to Ms. Ross, it wouldn't happen to the Judge or anyone else in this room but it did happen to Mr. Taylor because of how he looks. And this is a common thing that happens and this is Mr. Taylor's world that he has to live with. . . . he is so into his perception because of the way Mr. Taylor looks, that he was unwilling to consider anything else, any other possibilities. It is crack. He's black. And we all know that this type of thing happens in Pensacola. We all know. Just read the papers.

(*id*. at 190–91).  After less than ninety minutes of deliberations, the jury returned a guilty verdict on the tampering with evidence count and a not guilty verdict on the resisting arrest count (*id*. at 216, 223).

III.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States."  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254 now provides:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test in habeas cases was described by Justice O'Connor as follows:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may

---

[3]Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99, 120 S. Ct. at 1499–1503, 1511–16); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13, 120 S. Ct. at 1518–23).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding.  *See* Wellington v. Moore, 314 F.3d 1256, 1260–61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343–45 (11th Cir. 2002).  First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication.  Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343.  Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law.  Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent."  Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404–06).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the

"contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority." <u>Fugate</u>, 261 F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are <u>not</u> substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." <i>Id.</i> (citing and quoting <u>Williams</u>, 529 U.S. at 406).  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u>, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" <u>Bell v. Cone</u>, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting <u>Williams</u>, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that [the state court] judgment is infected by constitutional error." <u>Williams</u>, 529 U.S. at 389.  "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted).  Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent. <u>Van Poyck v. Fla. Dep't of Corrections</u>, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2),

determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); *see* <u>Miller-El v. Cockrell,</u> 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).") (dictum); <u>Fugate</u>, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); <u>Parker v. Head</u>, 244 F.3d 831, 835–36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); *see also* <u>Crawford v. Head</u>, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations).  Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. *See* <u>Callahan v. Campbell</u>, 427 F.3d 897, 926 (11th Cir. 2005) (citing § 2254(e)(1); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1308 (11th Cir. 2004) ("[Petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record.")).

IV.   EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[4] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation

---

[4]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)  the applicant has exhausted the remedies available in the courts of the State; or
        (B) (i)  there is an absence of available State corrective process; or
           (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  <u>Duncan</u>, 513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In <u>Picard v. Connor</u>, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.* at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In <u>Anderson v. Harless</u>, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* at 7 (citing <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Id.* (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim.  *Id.* at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan v. Henry</u>, 513 U.S. 364 (1995).  The <u>Duncan</u> Court strictly construed the exhaustion requirement so

as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[5]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  *Id.* at 365–66.  Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  The Baldwin Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*  With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . .  We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[6]

---

[5]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

[6]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  See Coleman v. Thompson, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); accord Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), rev'd on other grounds, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  Id.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  See Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[7]  Id.  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation

---

to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  Id.

[7]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1301–02 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

A petitioner can overcome a procedural default in two narrow circumstances.  The petitioner must either show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Henderson v. Haley, 353 F.3d 880, 892 (11th Cir. 2003); Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  Furthermore, the Eleventh Circuit has held that because there is no constitutional right to an attorney in state post-conviction proceedings, any ineffectiveness of post-conviction counsel cannot be "considered cause for the purposes of excusing . . . procedural default that occur[s] . . . at the state collateral post-conviction level."  Henderson, 353 F.3d 892 (citing 28. U.S.C. § 2254(i); Coleman v. Thompson, 501 U.S. 722, 752 (1991); In re Magwood, 113 F.3d 1544, 1551 (11th Cir. 1997); Johnson v. Singletary, 938 F.2d 1166, 1174–75 (11th Cir. 1991)).  To establish prejudice, a petitioner must show that there is "at least a reasonable probability that the result of the proceeding would have been different."  *Id.*

Alternatively, to satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further,

> [A] substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

V.      PETITIONER'S CLAIMS

>    A.      <u>Ground One:  The trial court departed from the essential requirements of the law, depriving Petitioner of his Sixth and Fourteenth Amendment rights.</u>

(Doc. 6 at 4).  In Ground One, Petitioner contends the trial court erred by admitting evidence that the vehicle driven by Petitioner had a stolen license plate (*id.* at 4A).  Petitioner argues that the validity of the stop was not an issue at trial; therefore, testimony regarding the reason for the stop was irrelevant (*id.*).  Petitioner further argues that any probative value of the testimony was outweighed by the prejudicial effect it had on his right to a fair trial because the testimony invited the jury to speculate on an irrelevant matter (*id.*).

Respondent argues that Petitioner failed to fairly present this issue to the state courts as a federal claim (Doc. 26 at 15).  Respondent argues that Petitioner presented the issue to the state courts as a state evidentiary issue, specifically, that the evidence was not relevant.

In his direct appeal, Petitioner claimed that the trial court erred by admitting evidence of the stolen license plate (Doc. 27, Ex. C at 10, 13–14).  However, Petitioner did not state a federal law basis for his claim in his state court brief.  For example, he did not cite in conjunction with the claim a federal source of law or a case deciding such a claim on federal grounds; indeed he did not even label his claim "federal" (*id.*).  Petitioner argued only that the trial court's evidentiary ruling was erroneous on the ground that any evidence regarding a stolen license plate was irrelevant, and the only probative value of the evidence was outweighed by its prejudicial effect on Petitioner's right to a fair trial (*id.*).  Petitioner cited only state cases in support of his claim, and those cases addressed only state law issues, including the standard of review for claims of erroneous evidentiary rulings, and that it was the State's burden to prove that the trial court's evidentiary ruling was harmless (*id.*).  If Petitioner wished to claim that the trial court's evidentiary ruling denied him the due process of law guaranteed by the Fourteenth Amendment, he should have said so in his state court brief.  Because Petitioner did not alert the state courts that his claim was federal in nature, the undersigned concludes that he did not satisfy the exhaustion requirement of section 2254.  *See* <u>Duncan</u>, 513 U.S. at 365); <u>Zeigler v. Crosby</u>, 345 F.3d 1300, 1307 (11th Cir. 2003) (finding that the petitioner's federal habeas claims were not raised in the state court when the direct appeal made no reference to the

federal constitutional issues raised in the federal habeas petition), *cert. denied*, 543 U.S. 842, 125 S.Ct. 280, 160 L. Ed. 2d 67 (2004).

Petitioner would be precluded from now raising this claim in the state courts as the state procedural rules do not provide for a second direct appeal, and a second Rule 3.850 motion would be subject to dismissal as a successive motion, pursuant to Rule 3.850(f).  Therefore, the claim is procedurally defaulted.  Petitioner does not allege cause for his failure to present his federal claim in the state courts, or that he will suffer prejudice as a result of this court's failure to review the claim.  Furthermore, he has failed to show that he is entitled to review under the "fundamental miscarriage of justice" exception to the procedural bar.  Therefore, he is not entitled to federal review of his claim.

> B.    Ground Two:  The trial court departed from the essential requirements of the law, depriving Petitioner of his right to a fair trial in violation of his Sixth and Fourteenth Amendment due process rights.

(Doc. 6 at 4).  In Ground Two, Petitioner contends that the trial court erred by admitting testimony regarding the field test on Petitioner's saliva performed by Officer Broxson on the ground that the State failed to lay a proper predicate including the following:  (1) evidence that the test was reliable, (2) evidence that Officer Broxson was qualified to perform the test, and (3) expert testimony concerning the meaning of the test (*id*. at 4B–4C).

Respondent argues that Petitioner failed to fairly present this issue to the state courts as a federal claim (Doc. 26 at 16).  Respondent argues that Petitioner presented the issue to the state courts as a state evidentiary issue, specifically, whether the trial court admitted the evidence in absence of the proper predicate required by state law (*id*.).

In his direct appeal, Petitioner claimed that the trial court erred by admitting evidence of the field test (Doc. 27, Ex. C at 10–11, 15–18).  However, as with Petitioner's prior claim, he did not state a federal law basis for his claim in his state court brief.  He did not cite a federal source of law or a case deciding such a claim on federal grounds; indeed, he did not in any way identify his claim as federal in nature (*id.*).  Petitioner argued only that the trial court's evidentiary ruling was erroneous on the ground that the trial court failed to conduct a hearing regarding the admissibility of the evidence as required by the Florida evidentiary rules, and there was no evidence regarding the officer's qualifications to perform the field test, to give an opinion about what the results

showed, or that the test was reliable, as required by Florida law (*id*.).  Petitioner also argued that the error was not harmless (*id*. at 11, 16–17).  Because Petitioner did not alert the state courts that his claim was federal in nature, the undersigned concludes that he did not satisfy the exhaustion requirement of section 2254.  *See* Zeigler, 345 F.3d at 1307.

As discussed *supra*, Petitioner would be precluded from now raising this claim in the state courts as the state procedural rules do not provide for a second direct appeal, and a second Rule 3.850 motion would be subject to dismissal as a successive motion, pursuant to Rule 3.850(f).  Therefore, the claim is procedurally defaulted.  Petitioner does not allege cause for his failure to present his federal claim in the state courts, or that he will suffer prejudice as a result of this court's failure to review the claim.  Furthermore, he has failed to show that he is entitled to review under the "fundamental miscarriage of justice" exception to the procedural bar.  Therefore, he is not entitled to federal review of his claim.

C.     Ground Three:  The trial court erred by granting the State's special jury instruction in violation of Petitioner's due process rights under the Sixth and Fourteenth Amendments.

(Doc. 6 at 5).  In Ground Three, Petitioner contends that the trial court erred by granting the State's request for a special jury instruction (*id*. at 5A).  Although Petitioner does not identify the jury instruction of which he complains, it is apparent that he is challenging the same instruction that he challenged on direct appeal of his conviction, namely, the following:

It is not necessary that the State prove the thing was cocaine or contraband.  It is sufficient if the defendant knew an investigation was about to begin and destroyed an object which he knew was the focus of the impending investigation.

(*see* Doc. 27, Ex. C at 19).  Petitioner argues that by erroneously admitting the field test evidence, the court put Petitioner in the position of having to rebut the evidence with testimony from the FDLE analyst; then the court compounded the error by using Petitioner's rebuttal as the basis for granting the special instruction (Doc. 1 at 5A).

Respondent argues that Petitioner failed to fairly present this issue to the state courts as a federal claim (Doc. 26 at 17).  Respondent argues that Petitioner presented the issue to the state courts as an issue of state law, specifically, whether the trial court abused its discretion by allowing the special jury instruction (*id*.).

In his direct appeal, Petitioner claimed that the trial court erred by granting the State's request for the special jury instruction (Doc. 27, Ex. C at 11, 19–20).  However, as with Petitioner's first two claims, Petitioner did not state a federal law basis for his claim in his state court brief.  Petitioner argued only that the trial court abused its discretion by granting the special instruction because the basis for the granting the instruction was that the defense had presented the FDLE analyst's testimony, but the defense may not have presented that testimony if the trial court had not erroneously admitted the field test evidence (*id*. at 20).  Petitioner cited only state law in support of his claim, namely, the standard of review for rulings on requests for jury instructions (*id*. at 19).  Because Petitioner did not alert the state courts that his claim was federal in nature, the undersigned concludes that he did not satisfy the exhaustion requirement of section 2254.  *See* Zeigler, 345 F.3d at 1307.

Again, Petitioner would be precluded from now raising this claim in the state courts as the state procedural rules do not provide for a second direct appeal, and a second Rule 3.850 motion would be subject to dismissal as a successive motion, pursuant to Rule 3.850(f).  Therefore, the claim is procedurally defaulted.  Petitioner does not allege cause or prejudice that would excuse his failure to present his federal claim in the state courts, or that he will suffer prejudice as a result of this court's failure to review the claim.  Furthermore, he has failed to show that he is entitled to review under the "fundamental miscarriage of justice" exception to the procedural bar.  Therefore, he is not entitled to federal review of his claim.

> D.      Ground Four:  Petitioner's exercising his right to a jury trial rather than accepting the plea offer became a factor in Petitioner's sentencing in violation of the Fourteenth Amendment.

(Doc. 6 at 5).  In Ground Four, Petitioner claims that the trial court punished him for exercising his right to a jury trial by imposing a habitual felony offender sentence (*id.*).  As factual support for his claim, Petitioner asserts that the trial court stated that there would be a "chilling effect" on state plea offers if the sentence she imposed after trial was not harsher than the State's pre-trial plea offer (*id*. at 5B).

Respondent claims that although Petitioner raised a claim of vindictive sentencing in his direct appeal, he presented it as a state law claim, not a federal claim; therefore, the claim was not exhausted (Doc. 26 at 19).

Upon review of Petitioner's brief on direct appeal, the undersigned concludes that Petitioner did present his claim as a federal constitutional issue.  Petitioner specifically argued that any sentence that discourages a person from exercising his right to a jury trial is unconstitutional under the Fifth and Sixth Amendments to the Constitution (Doc. 27, Ex. C at 12).  Additionally, one of the state cases cited by Petitioner in support of his claim, Daytona Beach v. Del Percio, 476 So.2d 197, 2055 (Fla. 1985), articulated the federal constitutional ramifications of vindictive sentencing (*id.* at 21–22).  Because Petitioner alerted the state courts to the federal nature of his claim, the undersigned concludes that the federal claim raised in the instant petition was exhausted in the state courts.

1.      Clearly Established Supreme Court Law

The only clearly established Supreme Court law with regard to vindictive sentencing is in the context of resentencing.  In North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072, 2080, 23 L. Ed. 2d 656 (1969), the Supreme Court held that in order to assure the absence of a vindictive motive by imposing a greater sentence upon resentencing than the sentence originally imposed, the resentencing judge's reasons for imposing the greater sentence must affirmatively appear on the record.  *Id.*, 395 U.S. at 726. Otherwise, a presumption arises that a greater sentence has been imposed for a vindictive purpose—a presumption that must be rebutted by "'objective information . . . justifying the increased sentence.'"  Texas v. McCullough, 475 U.S. 134, 142, 106 S. Ct. 976, 981, 89 L. Ed. 2d 104 (1986) (quoting United States v. Goodwin, 457 U.S. 368, 374, 102 S. Ct. 2485, 2489, 73 L. Ed. 2d 74 (1982)).

Subsequent cases of the Supreme Court have clarified that the presumption of vindictiveness "do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial." *See* Alabama v. Smith, 490 U.S. 794, 799, 109 S. Ct. 2201, 2204, 104 L. Ed. 2d 865 (1989) (quoting McCullough, 475 U.S. at 138).

As we explained in Texas v. McCullough, "the evil the [Pearce] Court sought to prevent" was not the imposition of "enlarged sentences after a new trial" but "vindictiveness of a sentencing judge." *Ibid. See also* Chaffin v. Stynchcombe, 412 U.S. 17, 25, 93 S. Ct. 1977, 1982, 36 L. Ed. 2d 714 (1973) (the Pearce presumption was not designed to prevent the imposition of an increased sentence on retrial "for some valid reason associated with the need for flexibility and discretion in the sentencing process," but was "premised on the apparent need to guard against vindictiveness in the resentencing process").  Because the Pearce presumption "may operate in the absence of any proof of an improper motive and thus . . . block a

legitimate response to criminal conduct," <u>United States v. Goodwin</u>, *supra*, 457 U.S. at 373, 102 S.Ct. at 2488, we have limited its application, like that of "other 'judicially created means of effectuating the rights secured by the [Constitution],' " to circumstances "where its 'objectives are thought most efficaciously served,' " <u>Texas v. McCullough</u>, *supra*, 475 U.S. at 138, 106 S. Ct. at 979, quoting <u>Stone v. Powell</u>, 428 U.S. 465, 482, 487, 96 S. Ct. 3037, 3046, 3049, 49 L. Ed. 2d 1067 (1976). Such circumstances are those in which there is a "reasonable likelihood," <u>United States v. Goodwin</u>, *supra*, 457 U.S. at 373, 102 S.Ct., at 2488, that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority. Where there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness, *see* <u>Wasman v. United States</u>, 468 U.S. 559, 569, 104 S. Ct. 3217, 82 L. Ed. 2d 424 (1984).

<u>Smith</u>, 490 U.S. at 799–800.

In <u>Colten v. Kentucky</u>, 407 U.S. 104, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972), the Supreme Court refused to apply the presumption of vindictiveness when the increased sentence was imposed by the second court in a two-tiered system which gave a defendant convicted of a misdemeanor in an inferior court the right to trial de novo in a superior court. The Court observed that the trial de novo represented a "completely fresh determination of guilt or innocence" by a court that was not being "asked to do over what it thought it had already done correctly." *Id.*, 407 U.S. at 117. If the de novo trial resulted in a greater penalty, the Court stated that "it no more follows that such a sentence is a vindictive penalty . . . than that the inferior court imposed a lenient penalty." *Id.* Consequently, the Court rejected the proposition that greater penalties on retrial were explained by vindictiveness "with sufficient frequency to warrant the imposition of a prophylactic rule." *Id.* at 116.

Similarly, in <u>Chaffin</u>, 412 U.S. 17, the Supreme Court held that no presumption of vindictiveness arose when a second jury, on retrial following a successful appeal, imposed a higher sentence than a prior jury, because the second jury was unlikely to have a "personal stake" in the prior conviction or to be "sensitive to the institutional interests that might occasion higher sentences." 412 U.S. at 26–28.

In <u>Smith</u>, the Supreme Court applied the same reasoning to conclude that when a greater penalty is imposed after trial than was imposed after a prior guilty plea, the increase in sentence is not more likely attributable to the vindictiveness on the part of the sentencing judge because "even when the same judge imposes both sentences, the relevant sentencing information available to the

judge after the plea will usually be considerably less than that available after a trial."   490 U.S. at 801.  For example,

> . . . in the course of the proof at trial the judge may gather a fuller appreciation of the nature and extent of the crimes charged.  The defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation.  *See* United States v. Grayson, 438 U.S. 41, 53, 98 S. Ct. 2610, 2617, 57 L. Ed. 2d 582 (1978) (sentencing authority's perception of the truthfulness of a defendant testifying on his own behalf may be considered in sentencing).  Finally, after trial, the factors that may have indicated leniency as consideration for the guilty plea are no longer present.  *See* Brady, 397 U.S. at 752.

Smith, 490 U.S. at 801.

   2.  Federal Review of State Court Decision

  As discussed *supra*, Petitioner raised this claim on direct appeal of his conviction.  The First DCA affirmed the conviction per curiam without written opinion (Doc. 27, Ex. F).  Although the state court denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable.  *See* Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326-27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

  Extending the reasoning of the Supreme Court in the cases discussed *supra* to the circumstances of the instant case, the undersigned concludes that absent a demonstration by Petitioner of a reasonable likelihood of actual judicial vindictiveness or punitive action on the part of the sentencing judge, Petitioner cannot establish a due process violation.  *See* United States v. Ramos, 130 Fed. Appx. 415, 421 (11th Cir. 2005) (unpublished).

  Petitioner asserts that the sentencing judge made clear that she would impose a higher sentence than offered by the State during plea negotiations because imposing the same sentence would be a disincentive for prosecutors to make plea offers.  The state court record does not support Petitioner's assertion. The trial transcript shows that after the jury was excused, the prosecutor asked that sentencing be set at a later date because she intended to seek a habitual felony offender sentence enhancement based upon Petitioner's criminal record (Doc. 27, Ex. B at 224).  Defense counsel responded:

The State issued an offer in this case of 11 months/15 days county jail and this was for both charges concurrent.  No notice of intent to seek habitual felony offender has been served on me.  The State's request basically has the effect of punishing Mr. Taylor for exercise [sic] his constitutional right to go to trial.  11 months/15 days county jail I submit to the Court is a presumptive sentence in this case.  He is scoring nonstate prison.  And I suggest if we even go down that road in this case, specially [sic] since the State has made this offer, it is going to have the effect of punishing Mr. Taylor for exercising his right to go to trial.

(*id*. at 225).  The trial judge stated:

All right, Mr. Brancato [defense counsel].  It is noted for the record.  I do want to just put into the record that obviously it is the Court, not the State who will impose sentence in this case and that just a general comment that you [sic], I know you understand that the State makes offers in an effort not to have to go to trial and there may be a chilling effect if the State is discouraged from making a plea offer sometimes . . . .

(*id*. at 225–26).  On February 7, 2001, the prosecutor filed a Notice of Intent to Seek Habitual Felony Offender Sentencing (*see* Doc. 27, Ex. G at 8).  The record shows that six months prior to trial, the State offered Petitioner a sentence of eleven and a half months in the county jail if he would plead guilty to the charges (*see id*. at 13, 38).  Obviously, Petitioner rejected that offer and chose to go to trial.  At the sentencing hearing, the prosecutor submitted certified copies of judgments of convictions and sentences showing that Petitioner had been previously convicted of at least two felonies in the State of Florida, and that he committed the instant offense within five years of the date of conviction of his last prior felony (*id*. at 10–11, 20–37).  Defense counsel did not contest the fact of the prior convictions or the dates thereof (*id*. at 11–12).  Additionally, the prosecutor informed the court that since Petitioner's arrest in the instant case, Petitioner had been charged in two other cases (*id*. at 15).  Petitioner's Criminal Punishment Code Scoresheet, to which defense counsel did not object (*see id*. at 12–13), showed that the lowest permissible sentence was a non-state prison sanction, and the statutory maximum for Petitioner's offense was five years in prison (*id*. at 43).  Pursuant to the habitual felony offender statute, the court had discretion to enhance Petitioner's sentence to ten years in prison.  Fla. Stat. § 775.084(4)(a).  At the sentencing hearing, defense counsel again argued that imposing a habitual felony offender sentence on Petitioner constituted a punishment for exercising his constitutional right to go to trial and denied him due process of law, to which the trial court responded:

> Let me just point out also just so it is in the record that, of course, the plea
> agreement is offered by the State and the defendant is free to take it.  As long as it
> is in the guidelines, I usually accept those, but obviously it is the Court's discretion
> after the trial.

(*id*. at 14, 16).  The court then sentenced Petitioner to five years imprisonment (*id*. at 47–51).

The record neither supports an inference of the judge's vindictiveness nor indicates that she gave any improper weight to Petitioner's rejecting the plea offer.  Initially, although Petitioner cites the judge's "chilling effect" comment as indicative of her intention to punish him for going to trial by imposing a higher sentence than the plea offer, the record does not support such an inference. The judge was merely responding to defense counsel's argument that the State's plea offer should be deemed a "presumptive sentence" by commenting that it was the court's role, not the State's, to impose sentence, and that adopting the "presumptive sentence" argument would discourage the State from making plea offers.

Additionally, the record establishes that Petitioner's sentence was within the guideline range of five years, and it was half of the ten-year sentence that he could have received as a habitual felony offender.  Furthermore, after Petitioner's trial, the court had a greater appreciation of the nature and extent of the crimes charged and insight into Petitioner's moral character and suitability for rehabilitation.  Moreover, in light of information regarding Petitioner's criminal history and pending criminal charges that came to light after trial and before sentencing, any factors that may have indicated leniency as consideration for a plea offer were no longer present.  Petitioner failed to demonstrate a reasonable likelihood that the judge imposed the five-year sentence as punishment for Petitioner's exercising his right to go to trial; therefore, the state appellate court's decision denying Petitioner's claim was not unreasonable.  Accordingly, Petitioner is not entitled to federal relief on this claim.

> E.    Ground Five:  Whether trial counsel rendered ineffective assistance of
> counsel for failure to conduct an adequate pretrial investigation into relevant facts
> surrounding the probable cause and/or illegal search, in violation of Petitioner's
> Sixth and Fourteenth Amendment rights.

(Doc. 6 at 5C).  Petitioner claims that he received ineffective assistance of trial counsel because counsel failed to conduct an adequate pre-trial investigation into the legality of the stop and search that led to his arrest (*id*.).  Petitioner asserts that he told counsel that the license plate of the vehicle

he was driving was not stolen, and if counsel had further investigated whether the plate was stolen, counsel would have discovered that it was not stolen, therefore, the police had no basis for stopping and searching Petitioner (*id*. at 5C–5D).  Petitioner further asserts that there is a "great probability" that he would not have been charged with a felony if counsel had conducted this pre-trial investigation (*id*. at 5D).

> 1.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under Strickland, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687–88.  It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof.  *Id.* at 687.  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

> In determining whether counsel's performance was reasonable, the Court instructed:
>
> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  *Cf.* Engle v. Isaac, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed.2 d 783 (1982).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *See* Michel v. Louisiana, *supra*, 350 U.S. at 101, 76 S.Ct. at 164.

Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Strickland, 466 U.S. at 693.  However, the Court has also clarified that a

petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

<u>Id.</u> at 694.  Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  <u>Id.</u> at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

<u>Id.</u> at 695–96.

### 2.     Federal Review of State Court Decision

Petitioner presented this claim as his first ground for relief in his Rule 3.850 motion (Doc. 27, Ex. G at 57).  The state court's written opinion identified the <u>Strickland</u> standard as the applicable standard for evaluating claims of ineffective assistance of counsel (<u>id.</u> at 153–54).  The opinion also included the following evaluation of Petitioner's claim:

In ground (a), the Defendant alleges that counsel was ineffective for failing to adequately conduct a pretrial investigation.  Specifically, the Defendant alleges that the tag on the car he was driving was not stolen, and thus the police did not have a legitimate reason to stop him.  The Defendant now claims that had his counsel conducted a proper investigation, then counsel would have discovered that fact and moved for dismissal.  However, the record reflects that counsel did discover facts regarding the tag and dealt with the issue.[FN 2].  Thus, the Defendant's first ground is conclusively refuted by the record.

[FN 2]  See 08/22/00 transcripts of the deposition of Shawn P. Dockery and subsequent Motion in Limine by defense counsel (both attached).  It appears that the tag was reported stolen, but the car was not the Defendant's and the Defendant had no knowledge of the legitimacy of the tag.

(Doc. 27, Ex. G at 154).

The state court correctly identified the two-prong <u>Strickland</u> standard as applicable to claims of ineffective assistance of counsel.  Additionally, the state court's factual findings are presumed correct as Petitioner has failed to rebut those findings with clear and convincing evidence.  Therefore, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable application of <u>Strickland</u>.

With regard to counsel's performance, the Eleventh Circuit has stated:

Trying cases is no exact science.  And as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that calls for great precision or for a categorical approach.  When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate."  <u>Atkins v. Singletary</u>, 965 F. 2d 952, 958 (11th Cir. 1992).  And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy."  <u>Devier v. Zant</u>, 3 F. 3d 1445, 1450 (11th Cir. 1993).  Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it can be shown that no reasonable lawyer, in the circumstances would have done so.

<u>Rogers v. Zant</u>, 13 F. 3d 384, 386 (11th Cir. 1994); <u>Grayson v. Thompson</u>, 257 F.3d 1194, 1216 (11th Cir. 2001) (to show counsel's performance was unreasonable, defendant must establish that no competent counsel would have taken the action that his counsel did take); <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (issue is not what is possible, prudent, or appropriate,

but what is constitutionally compelled) (citing <u>Burger v. Kemp</u>, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)).

However, not every strategic decision passes constitutional muster.  Whether a particular decision by counsel was a tactical one is a question of fact, <u>Hardwick v. Crosby</u>, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1); <u>Jackson v. Herring</u>, 42 F.3d 1350, 1367 (11th Cir. 1995); <u>Horton v. Zant</u>, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, <u>Hardwick</u> 320 F.3d at 1163; <u>Jackson</u>, 42 F.3d at 1367; <u>Horton</u>, 941 F.2d at 1462.

In the instant case, the state court record confirms that defense counsel did investigate the issue of whether the license plate was stolen by deposing Officer Dockery (Doc. 27, Ex. G at 164–65).  During the deposition, counsel elicited testimony from Dockery that he stopped Petitioner because the license plate of the vehicle he was driving was listed by the Escambia County Sheriff's Department as being stolen (*id*. at 160).  Officer Dockery further stated that the license plate was seized and turned over to the Sheriff's Department, but Petitioner was not charged in relation to the license plate because the vehicle was not his, and he stated he did not know anything about the license plate (*id*. at 164–65).  Because Petitioner failed to demonstrate that defense counsel performed unreasonably in his pre-trial investigation of whether the license plate was stolen, the state court decision denying Petitioner's claim was not unreasonable.

     F.    <u>Ground Six:  Whether trial counsel rendered ineffective assistance of counsel for failure to move for dismissal of the charges based on insufficient evidence, and failed to properly preserve his issue for appellate review in violation of Petitioner's Sixth and Fourteenth Amendment rights.</u>

(Doc. 6 at 5E).  Petitioner next claims that defense counsel performed deficiently by failing to move for dismissal of the charges on the ground that there was insufficient evidence to support them (*id*.). Petitioner asserts that the tampering with evidence charge was based on his alleged swallowing of cocaine, but the FDLE test showed that there was no controlled substance present in Petitioner's saliva (*id*. at 5E–5F).  Therefore, defense counsel should have moved for dismissal of the charges, and as a result of counsel's failure to do so, the issue of the sufficiency of the evidence was not preserved for appeal (*id*. at 5F).

1.      Clearly Established Supreme Court Law

As discussed *supra*, the two-prong <u>Strickland</u> standard is the legal standard applicable to claims of ineffective assistance of counsel.

2.      Federal Review of State Court Decision

In Ground (b) of Petitioner's Rule 3.850 motion, Petitioner argued that counsel was ineffective for failing to seek pre-trial dismissal of the charges based upon insufficiency of the evidence in light of the lab tests on Petitioner's saliva that were negative for the presence of controlled substances (*see* Doc. 27, Ex. G at 57–58).  In the written opinion denying Petitioner's claim, the trial court determined that there was not a legal basis for granting a motion to dismiss because the State was not required to prove that the object that Petitioner tampered with was an illegal substance (*id*. at 154).

The undersigned agrees with the state court that Petitioner has failed to show that defense counsel had a meritorious basis for seeking dismissal of the tampering charge.  Under Florida law, it is immaterial whether the object Petitioner attempted to swallow was, in fact, contraband.  *See* <u>State v. Jennings</u>, 666 So. 2d 131, 133 n.3 (Fla. 1995).  Because Petitioner failed to establish that defense counsel had an arguable basis for filing a pre-trial motion to dismiss, and that there is a reasonable probability that the trial court would have granted the motion if counsel had made it, the state court decision denying Petitioner's ineffective assistance of counsel claim was not unreasonable.

G.      <u>Ground Seven:  Whether trial counsel rendered ineffective assistance of counsel for failure to properly object and preserve for appellate review the court's denial of his request for additional jury pool members in violation of Petitioner's Sixth and Fourteenth Amendment rights.</u>

(Doc. 6 at 5G).  Petitioner asserts that approximately fifty (50) potential jurors were called the morning of his trial (*id*.).  Of these fifty, juries were selected for four trials, with Petitioner being the last to select a jury; thus, he was required to select his jury from only twelve remaining prospective jurors (*id*.).  Petitioner claims that defense counsel failed to properly object to the limited number of potential jurors; thus, the issue was not preserved for appellate review, and Petitioner was denied a fair trial (*id*.).

1.      Clearly Established Supreme Court Law

As discussed *supra*, the two-prong <u>Strickland</u> standard is the legal standard applicable to claims of ineffective assistance of counsel.

### 2.    Federal Review of State Court Decision

In Ground (c) of his Rule 3.850 motion, Petitioner conceded that defense counsel requested additional persons from which to select a jury, and that the trial court denied counsel's request (*see* Doc. 27, Ex. G at 58).  Petitioner additionally argued that defense counsel failed to protect his Sixth Amendment rights by allowing him to be tried by an all white jury (*id.* at 82).  The state court denied Petitioner's claim on the ground that he failed to demonstrate that he was prejudiced by counsel's alleged error (*id.* at 154–55).

The parties agree that 45-50 potential jurors from the venire were present for jury selection in three cases on the docket, one of which was Petitioner's (Doc. 27, Ex. B at 7).  Juries for two of the cases were selected from this group (*id.*).  When jury selection was about to begin for Petitioner's case, defense counsel requested a sidebar conference, during which he stated that Petitioner believed he was left to select from "residue," and he requested additional potential jurors from which to select a jury (*id.* at 8–9).  The trial judge denied the request on the ground that some of the remaining potential jurors in the group had not even been questioned for the earlier cases, and that those who had been questioned and rejected on the earlier cases were rejected for reasons unrelated to Petitioner's case (*id.*).  The record shows that the State and the defense questioned the remaining potential jurors (*id.*).  Both sides exercised peremptory and "for cause" challenges, and they agreed on a jury, including an alternate (*id.* at 25–32).  After the jury was selected, there were still potential jurors remaining who had not been selected; therefore, the court excused them from service (*id.* at 32–34).

The Sixth Amendment requires that the jury venire reflect a fair cross-section of the community.  <u>Taylor v. Louisiana</u>, 419 U.S. 522, 527, 95 S. Ct. 692, 696, 42 L. Ed. 2d 690 (1975)).  "To prove a prima facie violation of the fair cross-section requirement, a defendant is required to demonstrate that: (1) the allegedly excluded group is "distinctive" in the community; (2) the representation of the excluded group in <u>venires</u> is not "fair and reasonable" relative to the number of such persons in the community; and (3) this under representation is caused by the "systematic exclusion" of the group in the process of jury selection."  <u>Duren v. Missouri</u>, 439 U.S. 357, 364, 99

S. Ct. 664, 668, 58 L. Ed. 2d 579 (1979) (emphasis added).  However, the Sixth Amendment does not require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.  *See* Taylor, 419 U.S. at 538.

Furthermore, although the Equal Protection Clause forbids the discriminatory exclusion of petit jurors through the use of peremptory challenges by the prosecution, *see* Batson v. Kentucky, 476 U.S. 79, 96, 106 S. Ct. 1712, 1723, 90 L. Ed. 2d 69 (1986), there is no such prohibition based in the Sixth Amendment right to an impartial jury.  *See* Holland v. Illinois, 493 U.S. 474, 478, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990).

Initially, Petitioner did not allege, either in the instant petition or his state post-conviction motion, that black persons were systematically excluded during the process in which jurors were drawn from the jury list to serve on Petitioner's jury array; nor does the undersigned find any record evidence of this.  Therefore, Petitioner has failed to establish a violation of his Sixth Amendment right to an impartial jury.  Furthermore, Petitioner does not allege, nor does the record show, that the prosecutor exercised peremptory challenges to remove black persons from the venire, in violation of the Equal Protection Clause.  Therefore, Petitioner has failed to show that defense counsel performed deficiently by allowing Petitioner to be tried by an all white jury.  *See* United States v. Henderson, 409 F.3d 1293, 1305 (11th Cir. 2005).  Moreover, Petitioner has failed to show that if his counsel had objected to the racial composition of the petit jury on the ground that it was all white, there is a reasonable probability that the trial court would have sustained the objection. Therefore, the state court decision denying Petitioner's claim was not unreasonable.

H.      Ground Eight:  Whether trial counsel rendered ineffective assistance of counsel for failure to call witnesses who were identified by Petitioner and available to testify.

(Doc. 6 at 5-H).  Petitioner asserts that he provided defense counsel with the names, addresses, and telephone numbers of three defense witnesses who were available to testify, but counsel failed to call them as witnesses at trial (*id.*).  Petitioner asserts that if the witnesses had testified, there is a reasonable probability that he would have been acquitted (*id.*).

1.      Clearly Established Supreme Court Law

As discussed *supra*, the two-prong Strickland standard is the legal standard applicable to claims of ineffective assistance of counsel.

2.      Federal Review of State Court Decision

In Ground (d) of Petitioner's Rule 3.850 motion, Petitioner argued that counsel was ineffective for failing to investigate Maggie Abbey and Mary Row as witnesses for the defense and present their testimony at trial (Doc. 27, Ex. G at 58).

At the evidentiary hearing on Petitioner's Rule 3.850 motion, Petitioner's defense attorney at his trial, Rocky Brancato, testified that his office's first contact with Petitioner was at the county jail six days after Petitioner's arrest (*id.* at 101).  Mr. Brancato testified that an investigator from his office, Mr. Alverson, made the first contact (*id.*).  Petitioner was unwilling to cooperate with Mr. Alverson, in that he would not give a statement of his version of the events leading to his arrest, and he would not sign a waiver form allowing the public defender's office to represent him (*id.* at 101–02).  Approximately three months later, Mr. Brancato met with Petitioner at the public defender's office (*id.* at 102).  Mr. Brancato testified that Petitioner advised him of three possible witnesses that he might to able to obtain, but he did not disclose the names of any of the witnesses, except Maggie Abbey (*id.*).  Mr. Brancato told Petitioner to provide him with the names, addresses, and telephone numbers of the witnesses, and he would send an investigator to talk with them (*id.*).  At that time, Mr. Brancato already had a deposition of Maggie Abbey scheduled, but Petitioner informed him that he believed she was no longer in town as he had not seen her since he was released from jail (*id* at 102–03).  Mr. Brancato further testified that the deposition of Ms. Abbey never took place because he was unable to serve her with a subpoena (*id.* at 103).  He stated that he inquired with the prosecutor's office whether they had a different address for her, but they did not know her current address (*id.* at 103, 105).  Therefore, he sent an investigator to the old address which was a motel (*id.* at 105).  The investigator went to the motel but was unable to find Ms. Abbey (*id.*).  The investigator brought two registration receipts for the room where Ms. Abbey was allegedly staying, but neither of them bore Ms. Abbey's name, and the motel had no information about her whereabouts (*id* at 105–06).

Mr. Brancato testified that in September of 2000, three months after his meeting with Petitioner, he received a letter from Petitioner stating that "Mary," a woman who was working at the Pensacola Motor Lodge Hotel and living at the Salvation Army, could be a helpful witness (*id.* at 104).  However, Petitioner never provided him with "Mary's" last name (*id.*).  In response to

Petitioner's letter, Mr. Brancato asked Roger Rockwell, an investigator with the public defender's office, to investigate whether a woman named "Mary" was living at the Salvation Army (*id*.). Mr. Rockwell went to the Salvation Army and asked the director whether a woman named "Mary" lived there, but the director stated that no one named "Mary" lived there and that he did not know Maggie Abbey either (*id*. at 106).

On cross-examination by Petitioner, Petitioner asked Mr. Brancato whether there were records from his secretary that he (Petitioner) and "Mary" called Mr. Brancato several times (*id*. at 120). Mr. Brancato responded that he had instructed his secretaries to notify him whenever anyone called him at the office, and his file indicated that no one had contacted him regarding Petitioner's case from September of 2000 to February of 2001 (*id*. at 120). Mr. Brancato testified that after he deposed Officer Dockery, he informed Petitioner that the officer believed that Maggie Abbey had relocated to North Carolina (*id*. at 126–27).

Petitioner testified that Mr. Brancato told him that he would send an investigator to the motel where "Mary" was working, but he and "Mary" waited from March 9, 2000 to mid-August, and no one came (*id*. at 139–40). With regard to Maggie Abbey, Petitioner testified that he told Mr. Brancato that Ms. Abbey could be located at the hospital, the county jail, or the detoxification unit at Lakeview Center (*id*. at 141).

In the written opinion denying Petitioner's claim, the state court found as fact that Mr. Brancato was never given much information regarding Maggie Abbey or Mary Row, and that he followed up and investigated the information that he was provided in a timely manner (*id*. at 155). The court also found that Petitioner's allegation that the witnesses attempted several times to contact defense counsel was refuted (*id*.). Thus, the state court found that Mr. Brancato's testimony concerning his pre-trial investigation of Ms. Abbey and Ms. Row was more credible than Petitioner's testimony. Based upon Mr. Brancato's testimony, the court concluded that Petitioner's claim that counsel failed to properly investigate potential defense witnesses was without merit (*id*.).

Petitioner has failed to present clear and convincing evidence that the trial court improperly credited the testimony of Petitioner's counsel instead of Petitioner's testimony. Therefore, this court accepts the state court's factual findings, including its credibility determinations, as correct. Based upon the facts, the undersigned concludes that Mr. Brancato made reasonable efforts to contact

Maggie Abbey and "Mary," the only two persons who Petitioner identified as potential defense witnesses; therefore, Petitioner failed to demonstrate that his counsel performed deficiently in this regard.  Accordingly, the state court decision denying Petitioner's claim was not an unreasonable application of Strickland.

> I.      Ground Nine:  Whether trial counsel rendered ineffective assistance of counsel for misadvising Petitioner of the consequences of exercising his right to proceed to trial upon rejecting the State's plea offer, in violation of Petitioner's Sixth and Fourteenth Amendment rights.

(Doc. 6 at 5I).  Petitioner asserts that prior to trial, his counsel never advised him that he could receive a state prison sentence if he went to trial (*id*.).  Petitioner states that defense counsel informed him that the sentencing guidelines scoresheet indicated he would receive a non-prison sanction, and he could not be sentenced to a term in state prison if he proceeded to trial (*id*. at 5I–5J).  Petitioner states that if he had known of the possibility of the state prison sentence, he would have accepted the State's plea offer of 11 months and 15 days in the county jail (*id*. at 5J).

        1.      Clearly Established Supreme Court Law

As discussed *supra*, the two-prong Strickland standard is the legal standard applicable to claims of ineffective assistance of counsel.

        2.      Federal Review of State Court Decision

In Ground (e) of Petitioner's Rule 3.850 motion, Petitioner argued that counsel was ineffective for misadvising him that if he went to trial, he could not receive a state prison sentence, only county jail time (Doc. 27, Ex. G at 59).  Petitioner stated that if counsel had informed him that he could receive a five-year prison term if he went to trial, he would have accepted the State's plea offer of 11 months and 15 days in the county jail (*id*.).

At the evidentiary hearing on Petitioner's Rule 3.850 motion, Mr. Brancato testified that although he failed to advise Petitioner that he could be sentenced to ten years as a habitual felony offender if he proceeded to trial, since he was not aware that the State intended to seek the sentence enhancement until the State filed a notice of its intent to do so after Petitioner's trial, he did advise him that the maximum sentence he could receive on the tampering with evidence charge was five years in state prison (*id*. at 107–09).  Mr. Brancato also testified that on November 25, 2000, just three days before the trial, he met with Petitioner at the jail and again advised him that the maximum

sentence he could receive on the felony was five years, and an additional year on the misdemeanor (*id*. at 109).

Petitioner cross-examined Mr. Brancato on this issue as follows:

> Q.      . . . You don't recall telling me only about the 11/15 and not the five years?
>
> A.      I know for a fact that I advised you of the full range of penalties.  One thing about me, anytime I take a person to trial, I realize that I have a potential to either impact a persons' life in a positive or negative way.  And part of my system of the way I do things, in order for me to be happy with myself, is I want to make sure the client knows exactly what they're getting into.  And every single client that's ever went to trial with me has been advised of the maximum.  It's as simple as that.
>
> I want them to know what they could get because if I didn't advise them and if they got something more than that, I think that would reflect on me in a negative way on many different levels, and I'm not prepared to accept that.  So I can tell you for a fact that I told you, as I have told everyone who's went [sic] to trial with me, what the maximum is.  That's my policy.
>
> Q.      You don't remember telling me I only had 36 points?  It was nonprison sentence and I asked you could I go to prison and you said you got—you told me you got 36 points, you can't go to prison with 36 points.  You told me I would have to have 40 something at the time.  And I asked you how much time could I get at the most and you said 11 months, 15 days or a year, something like that, and asked—you went through how much time I would do on it, and I said 11 months, 15 days, or whatever, seven months or something like that.  And five years was never brought up.  It was only brought up about the 36 points was a nonprison sentence.  I couldn't go to prison.  That [sic] was no question about me going to prison, period—
>
> A.      No—
>
> Q.      —with the 36 points.  You would have to have 44 of them, you said, to go to prison.
>
> A.      I told you that you were in any nonstate prison range; and what that means is that the Judge has a lot of leeway in the case, that the Judge could give you anything from time served all the way up to the statutory maximum under the criminal punishment code.

Q.      Okay.  But at the time, the habitual—the other three crimes, or whatever, wasn't mentioned.  I mean, we didn't know nothing [sic] about that, period.  And it was only 36 points, period, which is a non sentence—I mean, a nonprison sentence.  Wasn't three other crimes to get you there [sic].  It was only 36 points, is all you and me talked about [sic].  There was no other way about it.  Going to prison, period, I even asked you and you told me there's no way that you could to go prison with 36 points.  You knew nothing about the habitual at that time.  We found out about that after I got sentenced.

A.      You had only 36 points.  My advice to you would have been that you could do up to the statutory maximum, the Judge has a lot of leeway, and maybe you were not listening to me.
. . . .
Because I know that you've had other cases under a different criminal—under a different scoresheet where there—this Judge could not sentence all the way up to the statutory maximums.  I know for a fact that you had cases under the older version, but I know for a fact that I also told you that you could get up to the statutory maximum, that I told you what the statutory maximum was.

(*id*. at 122–25).

In the written opinion denying Petitioner's claim, the state court found as fact that Mr. Brancato informed Petitioner that he faced up to five years in state prison if he went to trial, and that Petitioner received that sentence (*id*. at 155).  Therefore, the state court denied Petitioner's ineffective assistance of counsel claim (*id*.).

Petitioner has failed to present clear and convincing evidence that the trial court improperly credited the testimony of Petitioner's counsel instead of the testimony of Petitioner.  Therefore, this court accepts the state court's factual findings, including its credibility determinations, as correct.  Based upon the fact that Mr. Brancato advised Petitioner that he could receive a sentence of five years in state prison if he rejected the State's plea offer and proceeded to trial, Petitioner cannot show that he would have accepted the State's offer if he had known he could receive a state prison sentence; thus, he cannot satisfy the prejudice prong of the <u>Strickland</u> standard.  Accordingly, the state court decision was not an unreasonable application of <u>Strickland</u>.

J.      <u>Ground Ten:  Whether trial counsel rendered ineffective assistance of counsel for failure to properly preserve for appellate review the issue of whether the State met its burden of proof that Petitioner tampered with evidence, thus denying Petitioner his right to appellate review in violation of the Sixth and Fourteenth Amendments.</u>

(Doc. 6 at 5K).  Petitioner alleges that the basis for the tampering with evidence charge was that he swallowed crack cocaine in an attempt to destroy, conceal, or alter it with the purpose of impairing its availability in an investigation (*id*.).  He states that he was given a field test to determine whether he swallowed cocaine, the test was forwarded to a laboratory for testing, and the laboratory results were negative for the presence of cocaine (*id*. at 5K–5L).  Petitioner asserts that because the State failed to prove that he swallowed cocaine, the elements of the tampering charge were not satisfied (*id*.).

      1.      Clearly Established Supreme Court Law

As discussed *supra*, the two-prong <u>Strickland</u> standard is the legal standard applicable to claims of ineffective assistance of counsel.

      2.      Federal Review of State Court Decision

In Ground (f) of Petitioner's Rule 3.850 motion, Petitioner argued that counsel was ineffective for failing to argue that the State failed to meet its burden of proof because the evidence failed to show that the item tampered with was linked to a crime; instead, the evidence showed that the item was not cocaine (Doc. 27, Ex. G at 59).  The state court denied Petitioner's claim on the ground that whether or not the item was cocaine had no bearing on the case (*id*. at 155).

Initially, the record conclusively establishes that counsel made a motion for judgment of acquittal at the close of the State's case on the ground that the State failed to prove that Petitioner tampered with any type of evidence under the statute, and counsel renewed the motion after the defense rested its case, on the ground that the State failed to prove that Petitioner altered, destroyed, concealed or removed an item (Doc. 27, Ex. B at 134, 167–68).  Furthermore, even if counsel argued that the item was not actually cocaine, Petitioner has failed to show a reasonable probability that the trial court would have granted the motion since, as discussed *supra*, under Florida law it is immaterial whether the object Petitioner attempted to swallow was, in fact, contraband.  *See* <u>Jennings</u>, 666 So. 2d at 133 n.3.  Because Petitioner failed to demonstrate that counsel performed deficiently and that he was prejudiced by counsel's performance, the state court decision denying his claim was not unreasonable.

    K.    <u>Ground Eleven:  Whether the trial court departed from the requirements of the law by failing to make requisite findings of prior qualified felony conviction to</u>

> support imposition of a habitual felony offender sentence in violation of Petitioner's
> Fourteenth Amendment due process rights.

(Doc. 6 at 5M).  Petitioner's final claim is that the trial court was required by the Due Process
Clause and Florida law to find by a preponderance of the evidence the existence of each factor
necessary to impose habitual felony offender (HFO) status under the HFO provisions (*id.*).
Petitioner states that the court based the sentence enhancement on the judgments entered in case
numbers 97-1279-CFA6-01, 97-1964-CFA, 98-285, 93-5463-CFA6-01, 90-3650-CFA5T-01, 89-
4973-CFA6-01, and 85-6365-CFA5-01, but the convictions in those cases did not qualify him for
HFO status because the convictions in case numbers 97-1279, 97-1964, and 98-285 should have
been deemed a single conviction, and the other convictions were too old to be considered (*id.* at
5M–5N).

Respondent contends that Petitioner failed to fairly present this claim to the state courts (*see*
Doc. 26 at 8, 21).  Furthermore, Respondent argues that this claim is not cognizable on federal
habeas review because it is a purely state law issue, despite Petitioner's "bootstrapping" it as a
federal due process claim (*id.* at 12, 20–21).

Respondent is correct regarding the exhaustion issue.  Upon thorough review of the state
court record, there is no evidence that Petitioner raised this claim on direct appeal or in any of his
applications for collateral relief.  Because Petitioner did not present the instant claim to the state
courts, the undersigned concludes that he did not satisfy the exhaustion requirement of section 2254.

Petitioner would be precluded from now raising this claim in the state courts as the state
procedural rules do not provide for a second direct appeal, and a second Rule 3.850 motion would
be subject to dismissal as a successive motion, pursuant to Rule 3.850(f).  Therefore, the claim is
procedurally defaulted.  Petitioner does not allege cause or prejudice that would excuse his failure
to present his federal claim in the state courts, or that he will suffer prejudice as a result of this
court's failure to review the claim.  Furthermore, he has failed to show that he is entitled to review
under the "fundamental miscarriage of justice" exception to the procedural bar.  Therefore, he is not
entitled to federal review of his claim.

Based upon the foregoing, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that James R. McDonough is substituted for James V. Crosby, Jr. as Respondent.

And it is respectfully **RECOMMENDED**:

That the amended petition for writ of habeas corpus (Doc. 6) be **DENIED**.

At Pensacola, Florida, this 23<u>rd</u> day of January 2007.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**